UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MICHAEL P. KILEY, individually and as Trustee
of the Gina M. Kiley Family Trust of 2012, and
GINA M. KILEY, as Trustee of the Michael P.
Kiley Trust of 2012,

           Plaintiffs,

      v.                                    Case No. 24-C-968

NEWPORT GROUP, INC.,

           Defendant.

---

DECISION AND ORDER PARTIALLY GRANTING DEFENDANT'S
MOTION FOR JUDGMENT ON THE PLEADINGS

---

      This case arises from a dispute between Plaintiffs Michael and Gina Kiley and Defendant Newport Group, Inc., related to Defendant's purchase of Plaintiffs' business, Plan Administrators, Inc. (PAi). Plaintiffs assert claims of breach of contract and breach of the implied covenant of good faith and fair dealing against Defendant. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. On November 17, 2025, Defendant filed a motion for partial judgment on the pleadings. The court held oral argument on the motion on January 29, 2026. For the following reasons, the motion will be partially granted.

## BACKGROUND

      Plaintiff Michael Kiley co-founded PAi in 1983. PAi provides recordkeeping and retirement plan administration services for businesses with employer qualified retirement plans. Michael Kiley ran the company since its inception and served as its CEO until 2020, when Defendant acquired the company and took over operations. Michael Kiley sold his ownership

interest in PAi and a related entity called PAi Trust Company, Inc. to Defendant pursuant to a Stock Purchase Agreement (SPA). The parties agreed to the terms of the SPA on June 19, 2020, and the transaction closed on October 30, 2020.

The SPA refers to PAi and PAi Trust Company as "Targets," Plaintiffs as "Sellers," and Defendant as "Buyer." SPA at 5–6, 10–11, Dkt. No. 1-1. The SPA provides that the term "Affiliate" has the meaning set forth in Rule 12b-2 of the Securities Exchange Act of 1983. *Id.* at 5; *see also* 17 C.F.R. § 240.12b-2 ("An 'affiliate' of, or a person 'affiliated' with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.").

The SPA included two primary forms of monetary consideration for Defendant's purchase of PAi: Plaintiffs would receive an up-front purchase price of $53 million and an earnout payment, or "Earnout Amount", calculated based on the company's revenue. The SPA defines "Earnout Amount" using a complex set of nested definitions. The Earnout Amount is discussed in Section 2(g) of the SPA:

> Earnout Amount. As additional consideration for the Target Shares, Sellers shall be eligible to earn an additional amount (the "Earnout Amount"), subject to the terms and conditions set forth below, equal to the Fee Revenue. The Earnout Amount shall be determined in accordance with the Earnout Principles set forth on Exhibit B.

SPA § 2(g)(i). "Fee Revenue" is defined as "the amount equal to (i) New Fee Revenue, plus (ii) Earnout Redirected Revenue, minus (iii) Lost Fee Revenue; provided, however, in no event shall Fee Revenue be less than $0." *Id.* at 10. The definitions of "New Fee Revenue" and "Earnout Redirected Revenue" are relevant to the instant motion.

"New Fee Revenue" means "the aggregate amount of Annual Recurring Revenue attributable to each Earnout New Contract." *Id.* at 12. "Earnout New Contract," in turn, means

2

"Earnout Seller Contracts that are (i) executed by and between Earnout Customers and a Target or Buyer (or their Affiliates or successors in interest) during, and that are not terminated in writing prior to the expiration of, the Earnout Period and (ii) are Implemented prior to the Implementation Deadline." *Id.* at 9. "Earnout Seller Contracts" means

> each Contract that is executed with an Earnout Customer to provide services to such Earnout Customer or its clients if (i) such Contract is generated out of an Earnout Exclusive Partner Relationship; (ii) such Contract is generated out of an Earnout Mixed Partner Relationship and provides for one or more Earnout Mixed Partner Products; (iii) such Contract is serviced by the Earnout System; provided that contracts associated with a written strategic, alliance or distribution partner relationship with a third party (other than a Earnout Exclusive Partner or Earnout Mixed Partner) established by Buyer (or its Affiliates or successors in interest) shall not be considered an Earnout Seller Contract. If an Earnout Exclusive Partner or an Earnout Mixed Partner is involved in an equity or asset acquisition, merger or another transaction that results in a change of control of such Earnout Exclusive Partner or Earnout Mixed Partner, such transaction shall have no impact regarding whether a Contract is considered an Earnout Seller Contract and following any such transaction, the determination of whether a Contract is an Earnout Seller Contract shall be made on a reasonable basis to arrive at the same determination that would have been made if such transaction had not occurred.

*Id.*

The SPA defines "Earnout Exclusive Partner Relationship" as "the strategic, alliance and distribution partner relationships between a Target and those Persons identified as such on <u>Exhibit B</u> (such Persons, the '<u>Earnout Exclusive Partners</u>')" and "Earnout Mixed Partner Relationships" as "the strategic, alliance and distribution partner relationships between a Target and those Persons identified as such on <u>Exhibit B</u> (such Persons, the '<u>Earnout Mixed Partners</u>')." *Id.* at 8–9. Exhibit B of the SPA lists all of PAi's earnout principles. *Id.* at 91–95. The earnout principles are separated into two categories of partner relationships: earnout exclusive partner relationships and earnout mixed partner relationships and products. The earnout exclusive partner relationships section identifies the partners that had relationships solely with PAi. *Id.* at 91–92. The earnout mixed partner relationships and products section lists the partners that had relationships with both

3

PAi and Newport as well as the products that would be counted toward PAi's earnout amount. *Id.* at 92–95.

"Earnout System" means "the systems (commonly referred to as 'YBR') used to provide services by Targets as of the Effective Time and as the same may evolve from time to time." *Id.* at 9. In other words, the "Earnout System" was the platform or software system PAi used to service its customers.

As for "Earnout Redirected Revenue," the SPA defines this phrase to mean "the aggregate amount of Annual Recurring Revenue attributable to each Contract that otherwise would qualify as an Earnout Seller Contract under subsection (iii) of the definition thereof, but was moved by a Target, Buyer (or its Affiliates or successors in interest) from the Earnout System to, or placed onto, another system maintained by Buyer (or its Affiliates or successors in interest). For the avoidance of doubt, Earnout Redirected Revenue shall be calculated in accordance with the Earnout Principles set forth on Exhibit B." *Id.*

The SPA required Defendant to keep records of qualifying contracts and revenue during the "Earnout Period," defined to be the period from the date the sale closed until December 31, 2022. *Id.* at 9. During the earnout period, Defendant was required to use commercially reasonable efforts consistent with PAi's past practices to support PAi's business and foster its partnership relationships and leads, maintain the system used by PAi, and refrain from taking any action intended to adversely impact the earnout payment. Compl. ¶ 50. Section 2(g)(iv) of the SPA provides:

> Earnout Covenants. During the Earnout Period, unless otherwise agreed by Sellers, Buyer shall, and shall cause Targets (and their Affiliates and successors in interest) to (A) maintain sufficiently separate books and records (including, without limitation, financial statements and records) from Buyer's Affiliates in such manner as to allow the calculation of Fee Revenue and the Earnout Amount; (B) use Commercially Reasonable Efforts, substantially consistent with Targets' past

practices, with respect to Targets' Business, Earnout Exclusive Partner Relationships, Earnout Mixed Partner Relationships and Contracts with Earnout Customers; (C) maintain and operate the Earnout System in a manner substantially consistent with Target's past practices; and (D) not take any action intended to adversely impact the amount of Fee Revenue or the Earnout Amount.

SPA § 2(g)(iv).

Plaintiffs allege that, in roughly the summer of 2021, Defendant started to show signs that it was not complying with the earnout covenants. Compl. ¶ 84. In particular, Defendant was not devoting reasonable efforts toward running the PAi business and maintaining and soliciting partners and new contracts consistent with the requirements of the SPA. *Id.* On November 3, 2021, Defendant announced that it was to begin integrating with Ascensus, one of the country's largest retirement services providers and a direct competitor of PAi. *Id.* ¶¶ 96–97, 108. Ascensus's acquisition of Defendant closed in April 2022 at a purchase price of well over $1 billion. *Id.* ¶ 108. At that time, Defendant became a subsidiary of Ascensus and, as a result of the transaction, PAi became a subsidiary of Ascensus. *Id.* ¶ 108. Ascensus also became an affiliate of Defendant.

At issue in this motion is Defendant's compliance with the second earnout covenant: that Defendant "use Commercially Reasonable Efforts, substantially consistent with Targets' past practices, with respect to Targets' Business, Earnout Exclusive Partner Relationships, Earnout Mixed Partner Relationships and Contracts with Earnout Customers." SPA § 2(g)(iv). "Commercially Reasonable Efforts" is defined as "efforts and deployment of resources (including, without limitation, funding), consistent with the exercise of reasonable and prudent business judgment in good faith, normally used by a company in the industries of the Business for the servicing, development, promotion, marketing and commercialization with respect to products and services offered by Targets, including, without limitation, developing and maintaining partner and customer relationships and entering into Earnout New Contracts." *Id.* at 7.

Plaintiffs assert that Defendant failed to operate PAi in compliance with the earnout covenants. They cite five examples of Defendant's conduct: "changing PAi's brand image, neglecting existing and potential partners, failing to make efforts to capture business from the state mandate deadlines, not responding to partner requests for software enhancements, and setting unreasonably early deadlines for employers to sign up for plans." Compl. ¶ 197. With respect to Defendant's failure to make efforts to capture business from the state mandate deadlines, Plaintiffs contend that "PAi anticipated transformational growth by capturing business from the largest opportunity ever presented in the industry—upcoming state mandates requiring employers to offer retirement plans to their employees, dramatically increasing the number of small employers with demand for retirement plans and, relevant to PAi, recordkeeping services." *Id.* ¶ 39. Plaintiffs allege that they forecasted that the earnout could realistically reach as high as $100 million given the explosive growth attendant to the state mandates. *Id.* ¶ 44.

Plaintiffs assert that it was a "key part" of PAi's long-term growth strategy to invest in and lay the groundwork and infrastructure to capitalize on the anticipated state mandates and a potential federal mandate that could follow if the mandate was successful in enough states. *Id.* ¶ 68. Up to the time Defendant acquired PAi, PAi steadily worked with its partners to prepare for the state mandates, especially in California. *Id.* ¶ 77. California was one of the early adopters of a retirement plan mandate and PAi anticipated the mandate would boost PAi's customer base and revenue. *Id.* ¶ 74. PAi modified its software to accommodate the unique aspects of accounts under the state mandates. *Id.* ¶ 73. It also developed joint marketing materials about offerings that would provide mandate compliance and set up programs to capture customers who were looking for plans to comply with the law. *Id.* ¶ 77. PAi's leaders met quarterly to discuss plans and keep the company on track to capitalize on this business opportunity. *Id.*

Plaintiffs allege that, under Defendant's direction, however, "PAi deprioritized any efforts related to the state mandate." *Id.* ¶ 90. They assert that Defendant failed to cause PAi to use reasonable efforts to market PAi's retirement plan services by getting its name out and working with partners on programming and education around the mandate in California when the June 2022 deadline for smaller employers to offer retirement plans approached, as well as in Illinois when employers with 25 or fewer employees became subject to the mandate in 2022. *Id.* ¶ 150. Plaintiffs claim that this failure caused PAi's name to be noticeably absent from articles about the mandate and service provider options, even though several PAi competitors were often identified. *Id.* ¶ 151. They assert that internet search results showed that PAi was not engaging in the typical marketing efforts it had undertaken as a matter of course before Defendant purchased PAi. *Id.* ¶ 152. For example, Defendant did not take reasonable steps to ensure that PAi or its partners show up in web searches when California companies searched the internet using key words related to the state mandate. *Id.* ¶ 153. Historically, PAi frequently engaged in search engine optimization with partner websites that would drive business to the partner (and ultimately to PAi) through co-branded materials and key word targeting. *Id.* Plaintiffs maintain that a lack of content from PAi and its partners in internet searches strongly suggests these efforts were not made in the months leading up to the California small employer mandate deadline in June 2022. *Id.*

Plaintiffs assert that commercially reasonable efforts, consistent with PAi's past practices, would be for Defendant to have devoted substantial resources to raising brand awareness related to the state mandates and working with partners to plan for and market together toward employers signing up for new retirement accounts. *Id.* ¶ 158. They allege, upon information and belief, that Defendant and Ascensus did not market PAi as an alternative to the state-sponsored Ascensus plan in an effort to funnel revenue toward Ascensus and away from PAi. *Id.* ¶ 156.

7

Plaintiffs assert that "[c]ompanies in the retirement plan recordkeeping industry would normally undertake all of these efforts in the course of reasonable and prudent business judgment." *Id.* ¶ 159. As further evidence of Defendant's failure to use commercially reasonable efforts, Plaintiffs cite to one of PAi's competitor's success in opening retirement accounts. They contend the unidentified competitor, which had a similar focus on plans for small employers, opened tens of thousands of new retirement accounts between 2020 and 2022 due at least in part to its reasonable marketing efforts leading up to the mandate deadline. *Id.* ¶ 157. Plaintiffs allege that the goals of these efforts were to capture the business of the end users in the same market segment PAi traditionally targeted. *Id.*

On May 30, 2023, Defendant provided Plaintiffs with the final earnout statement, which set forth Defendant's final calculation of the earnout amount totaling $120,366. *Id.* ¶ 109. Plaintiffs allege the earnout amount was far below the tens of millions of dollars the parties reasonably anticipated. *Id.* ¶ 110. The earnout statements showed that PAi lost thousands of accounts after Defendant purchased and began operating PAi and that the number of accounts gained during the earnout period were far below the projections made. *Id.* ¶ 111. On July 11, 2023, Plaintiffs objected through counsel to the final earnout statement. *Id.* ¶ 113.

Plaintiffs assert that Defendant failed to consider revenue through Ascensus in the earnout calculation. Plaintiffs' allegations in the complaint concern the "New Fee Revenue" component of "Fee Revenue". *Id.* ¶ 115. They explain that contracts Defendant, Ascensus, or any other Defendant affiliate entered into during the earnout period that were generated through any of the identified strategic partners in Exhibit B constitute "Earnout New Contracts", even if PAi was not a party to the contract and the customer was not served by PAi's platform. *Id.* ¶ 119. Plaintiffs allege that "Ascensus did business with at least one of the strategic partners identified on Exhibit

B to the SPA" and that, "upon information and belief based on the high volume of Ascensus's business and the frequency of new contracts in the industry, [Ascensus] implemented contracts during the relevant time period that arose from that strategic partner and others on the list." *Id.* ¶ 121. They contend that the revenue from those contracts should have been, but were not, included in Defendant's calculation of the earnout amount. *Id.*

In sum, Plaintiffs allege that Defendant breached the SPA by failing to (1) provide PAi with a final earnout statement reflecting the proper fee revenue and pay Plaintiffs an appropriately calculated earnout and (2) maintain sufficiently separate books and records from Defendant's affiliates in such a manner as to allow for the correct calculation of fee revenue and the earnout amount (Count I). They also assert that Defendant breached the SPA by failing to (1) use commercially reasonable efforts, substantially consistent with PAi's past practices, with respect to PAi's business, earnout exclusive partner relationships, earnout mixed partner relationships, and contracts with earnout customers; (2) maintain and operate the earnout system in a manner substantially consistent with PAi's past practices; and (3) refrain from taking any action intended to adversely impact the amount of the fee revenue or the earnout amount (Count II). Finally, Plaintiffs allege that Defendant breached the implied duty of good faith and fair dealing (Count III). Defendant filed a motion for partial judgment on the pleadings, seeking to dismiss Count I in its entirety and partially dismiss Count II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Gill v. City of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017) (citing

9

*Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The court must draw all reasonable inferences and view all facts in the light most favorable to the plaintiff. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017). The court is not, however, "obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002). To survive a motion for judgment on the pleadings, the complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ANALYSIS

Defendant seeks to dismiss Plaintiffs' breach of contract claim asserted in Count I and partially dismiss the breach of contract claim asserted in Count II. Defendant asserts that Plaintiffs fail to plausibly allege a breach under the SPA's terms. The SPA provides that it is to be governed by and construed according to Delaware law. SPA § 10(h).

Under Delaware law, interpretation of a contract presents a question of law. *Rhone-Poulenc Basic Chems. Co. v. Amer. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "In construing a contract, a court will interpret the contract as a whole and give words in the contract their plain, ordinary meaning." *Joseph B.P. v. Kathleen M.P.*, 469 A.2d 800, 802 (Del. 1983) (internal quotation marks and citation omitted). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1195. "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent

10

with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). With these considerations in mind, the court turns to the parties' arguments.

## A. Breach of Contract (Count I)

Plaintiffs allege that Defendant breached the SPA by failing to (1) provide PAi with a final earnout statement reflecting the proper fee revenue and pay Plaintiffs an appropriately calculated earnout and (2) maintain sufficiently separate books and records from Defendant's affiliates in such a manner as to allow for the correct calculation of fee revenue and the earnout amount (Count I). Plaintiffs allege that the earnout amount calculated by Defendant is artificially low because Defendant did not account for any Ascensus qualifying contracts in the "Fee Revenue" formula. Compl. ¶ 11. To repeat, "Fee Revenue" equals "New Fee Revenue" plus "Earnout Redirected Revenue" minus "Lost Fee Revenue". SPA at 10. Plaintiffs contend that revenue from contracts with Defendant or its affiliates may qualify as either "New Fee Revenue" or "Earnout Redirected Revenue".

"New Fee Revenue" is the aggregate amount of annual recurring revenue attributable to each "Earnout New Contract". *Id.* at 12. Plaintiffs allege that any contract Defendant, Ascensus, or any other affiliate entered into during the earnout period that was generated through any of the partners identified in Exhibit B, even if PAi was not a party to the contract and the customer was not served by PAi's platform, constitute "Earnout New Contracts". Compl. ¶ 119. They argue that all of the revenue growth generated out of Ascensus's business relationships that overlapped with PAi's own relationships must count toward the earnout amount and Defendant should have maintained records to determine whether Ascensus' contracts should be counted toward the earnout amount.

Defendant counters that a contract does not qualify as an "Earnout New Contract" simply because there is a contract between Defendant or Ascensus and an Exhibit B partner. It maintains that Plaintiffs are not entitled to an earnout payment from the revenue growth of Ascensus that was generated independent of the efforts of Plaintiffs and PAi. Defendant argues that the plain language of the SPA requires that an "Earnout New Contract" must be generated out of PAi's relationship with an Exhibit B partner.

The court agrees. Reading the contract language for "Earnout New Contract" with the nested definitions of "Earnout Seller Contracts", "Earnout Exclusive Partner Relationship", "Earnout Mixed Partner Relationship", and "Earnout System", the SPA states that "Earnout New Contracts" include such contracts that are generated out of a strategic, alliance and distribution partner relationship between PAi and those persons identified in Exhibit B or are serviced by the software systems PAi used to provide its services. Thus, when the SPA is read as a whole and its meaning construed according to its plain language, *see Joseph B.P.*, 469 A.2d at 802, "Earnout New Contracts" must be generated out of PAi's partner relationship with a person identified in Exhibit B.

Plaintiffs allege that "Ascensus did business with at least one of the strategic partners identified on Exhibit B to the SPA, and upon information and belief based on the high volume of Ascensus's business and the frequency of new contracts in the industry, implemented contracts during the relevant time period that arose from that strategic partner and others on the list." Compl. ¶ 121. They surmise that "for partners who worked with both PAi and Ascensus, it is plausible and likely that once those partners learned of PAi being acquired by Ascensus, they would funnel more customers to Ascensus rather than PAi, even for the segment of business they would have otherwise directed to PAi." Dkt. No. 57 at 10. Plaintiffs contend that "[t]he revenue from those

[Ascensus] contracts should have been, but was not, included in [Defendant's] calculation of the earnout amount." Compl. ¶ 121. But the complaint contains no allegations to support this proposition. Plaintiffs do not allege that Ascensus's contracts were either generated out of PAi's relationship with a person identified in Exhibit B or generated out of both PAi's relationship with an Exhibit B partner and Ascensus's relationship with the same partner.

Plaintiffs contend that they are not required to plead legal theories in their complaint. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned through discovery." (citations omitted)). Indeed, a plaintiff may pursue legal theories not articulated in the complaint, but the legal theories must be grounded in the complaint's factual allegations. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("the question . . . is simply whether the complaint includes factual allegations that state a plausible claim for relief"). After all, defendants are entitled to fair notice of the factual allegations that support a plaintiff's claim for relief and "should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 802–03 (7th Cir. 2008). Plaintiffs' complaint does not include a set of operative facts to state a plausible claim for relief on this basis. The complaint contains no allegations from which the court can infer that Defendant failed to account for revenues generated even partially out of any PAi relationships.

As for "Earnout Redirected Revenue", Plaintiffs argue that this category of revenue is not limited to revenue from contracts with PAi or from customers serviced by PAi's platform. They contend this category is much broader and includes revenue that *could* have been serviced on PAi's platform. "Earnout Redirected Revenue" is defined as

13

> the aggregate amount of Annual Recurring Revenue attributable to each Contract that otherwise would qualify as an Earnout Seller Contract under subsection (iii) of the definition thereof, but was moved by a Target, Buyer (or its Affiliates or successors in interest) from the Earnout System to, or placed onto, another system maintained by Buyer (or its Affiliates or successors in interest). For the avoidance of doubt, Earnout Redirected Revenue shall be calculated in accordance with the Earnout Principles set forth on Exhibit B.

SPA at 9. In other words, "Earnout Redirected Revenue" is the aggregate amount of annual recurring revenue attributable to each contract that is serviced by PAi's system or platform but was moved by PAi, Defendant, or its affiliates from such system or placed onto another system that Defendant or its affiliates maintained.

Although Plaintiff argues that "Earnout Redirected Revenue" includes revenue that *could* have been serviced on PAi's platform, the plain language of the SPA requires that, to qualify as "Earnout Redirected Revenue", a contract already serviced by PAi's earnout system must have been placed onto another system maintained by Defendant. In any event, there are no allegations in the complaint that any "Earnout Redirected Revenue" was missing from the earnout calculation.

In sum, the complaint contains no allegations from which the court can infer that Defendant breached the SPA by failing to (1) provide PAi with a final earnout statement reflecting the proper fee revenue and pay Plaintiffs an appropriately calculated earnout and (2) maintain sufficiently separate books and records from Defendant's affiliates in such a manner as to allow for the correct calculation of fee revenue and the earnout amount. Plaintiffs have failed to state a breach of contract claim upon which relief can be granted on this basis. Therefore, Plaintiffs' breach of contract claim set forth in Count I of the complaint must be dismissed.

## B. Breach of Contract (Count II)

Plaintiffs allege that Defendant breached the SPA by failing to (1) use commercially reasonable efforts, substantially consistent with PAi's past practices, with respect to PAi's

14

business, earnout exclusive partner relationships, earnout mixed partner relationships, and contracts with earnout customers; (2) maintain and operate the earnout system in a manner substantially consistent with PAi's past practices; and (3) refrain from taking any action intended to adversely impact the amount of the fee revenue or the earnout amount (Count II). The issue presented in the instant motion is whether Defendant was required to operate PAi's business in conformity with PAi's competitors as well as in conformity with PAi's own past practices.

As relevant here, the earnout covenants provision provides that "[d]uring the Earnout Period, unless otherwise agreed by Sellers, Buyer shall, and shall cause Targets (and their Affiliates and successors in interest) to . . . use Commercially Reasonable Efforts, substantially consistent with Targets' past practices, with respect to Targets' Business, Earnout Exclusive Partner Relationships, Earnout Mixed Partner Relationships and Contracts with Earnout Customers . . . ." SPA § 2(g)(iv). "Commercially Reasonable Efforts" is defined as "efforts and deployment of resources (including, without limitation, funding), consistent with the exercise of reasonable and prudent business judgment in good faith, normally used by a company in the industries of the Business for the servicing, development, promotion, marketing and commercialization with respect to products and services offered by Targets, including, without limitation, developing and maintaining partner and customer relationships and entering into Earnout New Contracts." *Id.* at 7.

Plaintiffs assert that the SPA's definition of "Commercially Reasonable Efforts" required Defendant to operate PAi's business not only in conformity with PAi's past practices but also in conformity with PAi's competitors. Although Plaintiffs argue that limiting Defendant's commercially reasonable efforts only to PAi's past practices would render the definition of "Commercially Reasonable Efforts" meaningless, the earnout covenants provision clearly

15

qualifies Defendant's obligation to use "Commercially Reasonable Efforts" that are "substantially consistent with [PAi's] past practices." *Id.* § 2(g)(iv). In short, by the plain language of the SPA, Defendant's commercially reasonable efforts would be qualified by looking at PAi's past practices, not the practices of PAi's competitors. *See Joseph B.P.*, 469 A.2d at 802.

Defendant argues that this portion of the breach of contract claim must be dismissed because Plaintiffs do not specify what conduct was not substantially consistent with PAi's past practices. It maintains that the allegations in Plaintiffs' complaint as to Defendant's failure to capture business from state mandates are not plausibly pled with reference to PAi's past practices. Plaintiffs claim that Defendant did not take reasonable steps to ensure that PAi or its partners show up in web searches when California companies searched the internet using key words related to the state mandate. Compl. ¶ 153. As to PAi's past practices, Plaintiffs allege that, historically, PAi frequently engaged in search engine optimization with partner websites that would drive business to the partner (and ultimately to PAi) through co-branded materials and key word targeting. *Id.* They contend that the lack of content from PAi and its partners in internet searches strongly suggests that these efforts were not made in the months leading up to the California small employer mandate deadline in June 2022. *Id.* At this stage of the litigation, accepting as true all factual allegations and all inferences that can reasonably be drawn from them, *Milwaukee Police Ass'n*, 863 F.3d at 640, Plaintiffs have sufficiently pled a plausible breach of contract claim that Defendant failed to use commercially reasonable efforts consistent with PAi's past practices to capture market share as a result of a new state mandate in California.

## CONCLUSION

For these reasons, Defendant's motion for judgment on the pleadings (Dkt. No. 55) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is granted as to Plaintiffs' breach

of contract claim set forth in Count I of the complaint and that claim is dismissed. As for the breach of contract claim set forth in Count II, it is clear that the plain language of the SPA contemplates that Defendant's commercially reasonable efforts would be qualified by looking at PAi's past practices, not the practices of PAi's competitors. Consistent with this interpretation of the SPA, Plaintiffs have sufficiently pled a breach of contract claim that Defendant failed to use commercially reasonable efforts consistent with PAi's past practices to capture market share as a result of a new state mandate in California. The clerk is directed to set the matter on the court's calendar for a telephone conference to discuss further proceedings.

  **SO ORDERED** at Green Bay, Wisconsin this 30th day of January, 2026.

                      _____
                      William C. Griesbach
                      United States District Judge